# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                          CASE NO.  8:23-cr-389-WFJ-AEP

SHELDON ROBINSON,
     Defendant.

_____/

## DEFENDANT ROBINSON'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCHES OF HIS BODY

The defendant Sheldon Robinson moves to suppress evidence pursuant to Rules 12 (b)(1) and 41 of the Federal Rules of Criminal Procedure and the Fourth Amendment to the United States Constitution, stating as follows:

**A. Introduction.**

The search warrant challenged here was not disclosed to the defense until January 23, 2025, well after the motion deadline of December 1, 2024, explaining the filing of this motion beyond that deadline. The defendant Robinson moves to suppress all evidence seized from a search of his body pursuant to that warrant, including DNA, photographs, blood samples,

buccal swabs, clothing, nail clippings and swabbing of nail beds, and all information gathered as a result. On February 8, 2023, Detective Kevin Keiper sought and was granted a search warrant for the search of Mr. Robinson's body as described above. The affidavit in support of the warrant was deficient as described below.

**B. The affidavit supporting the body search warrant contains illegally obtained information, facts which are false or made in reckless disregard for the truth and had material omissions.**

**1. The Tag Reader.**

On February 8, 2023, officers obtained a warrant to search Mr. Robinson's body. Relevant to this motion, the affidavit states:

> The Hernando Sheriff's Office had a stationary license plate reader at Dr. Martin Luther King Jr Blvd and Muhammed Ali Way, which is 0.3 miles east of Hazel Avenue and the crime scene. The 911 call came in at 23:29:06, and at 23:31:04 the reader captured the Florida license plate ZB19NV driving west on Dr. MLK Blvd.

Ex 1, Aff p. 2, DISC 050329. From the reader information, the affidavit relates, law enforcement found the owner of the red Blazer and then found the Blazer itself in the same neighborhood on Fennery Avenue. There was a red sneaker in the back matching one a K-9 found earlier, and officers questioned

2

Keshawn Woods, who said he was the driver and implicated Mr. Robinson as the shooter, saying he dropped him off afterward. Ex A, Aff. P. 3.

Use of the tag reader's database is an unconstitutional search, equivalent to the warrantless cell site location searches the Court found unlawful in *Carpenter v. United States*, 585 U.S. 296 (2018). The Eleventh Circuit recently faced a similar challenge in *United States v. Mapson*, 96 F.4th 1323 (11th Cir. 2024), but did not address the issue directly because *Carpenter* came down the day after the police pulled the video of the license plate in that case so the court ruled the good faith exception would apply no matter what. The sheriff's office described its reliance on the LEARN database to track the Blazer's movement through a nearby intersection at a time close to the shooting. That database is described in *United States v. Yang*, 958 F. 3d 851, 855 (9th Cir. 2020), and it not only captures license plate data, but vehicle types. In fact, it provides a picture of the entire vehicle and a readout of addresses near where the vehicle was located. The ability to retrospectively track an individual's vehicle movement is akin to law enforcement's ability to obtain cell-site location, which is now unquestionably unconstitutional without a warrant. See *Riley v. California*, 573 U.S. 373 (2014) and *Carpenter v. United States*, 585 U.S. 296 (2018). There

3

is no meaningful distinction between CSLI data and ALPR data for Fourth Amendment purposes, and compelling reasons to recognize both should have the same constitutional constraints.

Accordingly, the Supreme Court's holding in *Carpenter* should extend to the ALPR data in this case, and this Court should find that the collection of ALPR data qualifies as a search and therefore requires a warrant supported by probable cause. The Eleventh Circuit recently interpreted *Carpenter* to hold "that the acquisition of historical cell-site records is a search under the Fourth Amendment, so the government must obtain a warrant to access such records." *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020). Other courts have found the information public and rejected this issue. This Court should not place any reliance on *United States v. Wilcox*, 415 F. App'x 990, 991–92 (11th Cir. 2011), an unpublished Pre-*Carpenter* opinion now over a decade old which held that a police officer's use of tag reader technology to read Wilcox's car license plate did not violate his Fourth Amendment right. *Mapson* didn't find it dispositive and neither should this Court.

This court should not consider any information resulting from the illegal tag search in determining probable cause.

4

**2. The affidavit does not contain sufficient information to rely on Keshawn Woods' statements and failed to recount knowingly false information he had earlier provided to law enforcement.**

To establish probable cause, the affidavit also relies on a person police say was a participant in the killing, Keshawn Woods. According to the affidavit, Woods implicated Robinson when he was interviewed at the police station:

> During the interview with Keshawn, he admitted to his involvement in the shooting as the driver of the vehicle. Keshawn suggested that he was asked by a subject known to him as "Po Boy" who was later identified as Sheldon Robinson to take him to the area of Hazel Avenue as he had some business to handle. Keshawn explained that he did not ask questions and took Sheldon along with Willie Bates to the area. Keshawn advised that after dropping Sheldon off, he heard gunfire a short time later and Sheldon returned to the vehicle. Forensic technicians also collected 10 9 mm shell casings from around the door of 707 Hazel Avenue, where La Shawn Pope stated that she and Isabella had been shot.

Ex 1 Aff. P. 3, DISC-050330.

The affidavit contains no further information about Woods. The complete failure to identify or describe Keshawn Woods' background or other reasons to believe what he said renders cause improbable under the totality of circumstances analysis of *Gates*:

> *Gates* changed the "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), into a totality

5

>of the circumstances test. *See Gates*, 462 U.S. at 230-35, 103 S.Ct. 2317. Under the Gates totality of the circumstances test, the "veracity" *1353 and "basis of knowledge" prongs of *Aguilar*, for assessing the usefulness of an informant's tips, are not independent. "[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for ... by a strong showing as to the other[.]" *Id.* at 233, 103 S.Ct. 2317.

*United States v. Brundidge,* 170 F.3d 1350, 1352-53 (11th Cir. 1999). The affidavit contains no information regarding the veracity or basis of knowledge of the witnesses. While "[t]he courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources" *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006), Woods most definitely was not either.

In addition, the affiant failed to disclose that Woods repeatedly provided information to law enforcement that they knew was false, telling Woods at one point in the interview that "none of this stuff is adding up, all right? What I can tell you about lies is you're not going to remember them anymore." Ex 2, *Woods Statement* 1, T55.

Woods at first denied even being in the car that day. And contrary to what Woods initially said, police did not believe Willie Bates was in the car or

6

otherwise involved in the shooting, primarily because his cellphone showed otherwise. Police did not believe Woods stopped so Robinson could urinate. Police did not believe Woods that he had given his shoes to Tyler or Robinson or anyone else to wear that day. And finally, police did not believe Woods was not at the door during the shootings. Ex 2.

From the outset of the initial interview, Woods denied any involvement and tried to establish an alibi while denying driving the Blazer in the late evening hours:

> THE DETECTIVE So when's the last time you drove the car?
>
> KEYSHAWN WOODS: I drove the car yesterday.
>
> THE DETECTIVE: Yeah? Where to?
>
> KEYSHAWN WOODS: I drove it to the Family Dollar. (Unintelligible).
>
> THE DETECTIVE: Okay. What time was that, you remember?
>
> KEYSHAWN WOODS: That was like, uh, 8:00 o'clock.
>
> THE DETECTIVE: At night?
>
> KEYSHAWN WOODS: Yeah.
>
> THE DETECTIVE: Yeah. All right, so to the Family Dollar. What, did you pick up some food and shit?
>
> KEYSHAWN WOODS: Yeah, she had me pick up some soda.

7

>THE DETECTIVE: Okay. Were you with anybody or was it just you?
>KEYSHAWN WOODS: No, it was just me.
>THE DETECTIVE: Okay. So when you left the Family Dollar, where did you go?
>
>KEYSHAWN WOODS: I came back to the house.
>
>THE DETECTIVE: Okay. Uh, and you never went anywhere else from there?
>
>KEYSHAWN WOODS: No. I left. I still left.
>
>THE DETECTIVE: Okay.
>
>KEYSHAWN WOODS: Well, I didn't leave in the car. I left with my brother.
>
>THE DETECTIVE: Oh, okay.
>
>KEYSHAWN WOODS: Quan [phonetic].
>
>THE DETECTIVE: Okay.
>
>KEYSHAWN WOODS: (Unintelligible).
>
>THE DETECTIVE: Yeah. So where did you --where did you go with Quan?
>
>KEYSHAWN WOODS: I went to his house.

Ex. 2, T. 8-10.

Woods went on to say that he stayed at his brother's until 11:00 and then Nina picked him up and took him home. Ex 2, T 10-12. Woods said he went to sleep around one or two and he denied driving the Blazer again that

8

night. Ex. 2, T 13,14. Woods did speculate that a guy named Ed took the Blazer out that night. Ex. 2, P.14. When asked what he knew about the murder, the conversation went as follows:

> The Detective: What do you know about that that happened last night?
>
> Keshawn Woods: Nina told me everything.
>
> The Detective: What did she tell you?
>
> Keshawn Woods: She told me that her cousin got shot.

Ex. 2, T. 15.

Woods was then confronted about the Blazer not being at his house all night, and the detective wanted to know who was driving this car.

> The Detective: If you're telling me it was just you - -
>
> Keshawn Woods: No I drive the car. I drive the car and he sends Ed to get the car too.
>
> The Detective: Uh huh.
>
> Keshawn Woods: See what I'm saying? I don't know if Ed came there and got the car when I was at my brother's house with Nina.
>
> The Detective: Uh huh
>
> Keshawn Woods: But it was parked there when I pulled back up to the house.

Ex 2, T. 21-22.

9

Law enforcement found a red Nike Airforce shoe near the scene of the crime. Keshawn told the detective he had red Nike Airforce shoes that he kept in the Blazer for work. Ex. 2, T. 30 The Detective told Woods that one of the red Nike Airforce shoes was in the truck, and Woods then concocts a fantastical story that he lent one to someone else:

> Keyshawn: Yeah, one yeah one -- of my red ones. It should be my right one because my left one I gave away to my homeboy because he got some too (unintelligible).
>
> The Detective: Yeah? Who'd you give it to?
>
> Keyshawn: Tyler.
>
> The Detective: Tyler?
>
> Keyshawn: Can't think of his last name. I'm not trying to lie. I'm not trying to lie.

Ex. 2, T. 29-31.

Woods goes on to describe Tyler as a white dude who lives in the projects. Ex. 2 T. 30, 31. He denied driving the car or knowing who shot the girl.

> THE DETECTIVE: Okay. So do you know who shot this girl?
>
> KEYSHAWN WOODS: No.
>
> THE DETECTIVE: Okay. Did you drive this car over there?
>
> KEYSHAWN WOODS: No, sir. I was with Nina and

10

my brother.

*Ex. 2, T. 39.*

Police asked Woods where Ice (Willie Bates) was and Keshawn denied being with him:

>THE DETECTIVE: Where was he at last night?
>
>KEYSHAWN WOODS: Ice?
>
>THE DETECTIVE: Yeah.
>
>KEYSHAWN WOODS: I think he was with -- at his house with his brother.

*Ex. 2, T. 40,4.1*

When confronted about the shoe at the crime scene Woods again denied the single red Nike Airforce shoe found near the scene was his, the exchange went as follows:

>THE DETECTIVE: Okay. So how would that right shoe end up on the shooting scene?
>
>KEYSHAWN WOODS: That's not my shoe. It can't be my shoe.
>
>THE DETECTIVE: Why not? Why can't it be?
>
>KEYSHAWN WOODS: Because how would it be all the way in town?

Ex 2, T45.

Although at this point in the interview Woods had never put himself at the scene or admitted involvement the detective still told Woods he needed Woods's time frame "because it's been different twice." T47. The two went over Woods's whereabouts and times again, T47-54, and the detective observed: "So you can see why we want to go back over those things because you just added like four extra stops that we haven't talked about yet. It's okay, but that's what you're telling me because that --none of this stuff is adding up, all right? What I can tell you about lies is you're not going to remember them anymore." T55.

After more questioning, Woods then says he kind of knew what was happening when "he [poboy] ran back to the car." T64-65. He then explained poboy paid him $43 to "take him around the block." T66. Woods pulled out, he jumped out, ran back 15 minutes later, and Woods had heard gunshots. T67. The two didn't talk about it.

None of this is mentioned in the affidavit. The substantial misrepresentation of Woods' veracity, his continued lies even after making some admissions, and related material omissions and were well known to law enforcement. The affidavit violates *Franks,* and reference to Woods' statements must be excised for the probable cause analysis. When the

12

improper statements are excised, the affidavit is insufficient to support probable cause for the issuance of a warrant for the body search.

**Items sought to be Suppressed.**

The items sought to be suppressed are those listed in the inventories and return, and all observations by law enforcement officers.

### Derivative Fruits.

The defendant moves to suppress al derivative fruits including but not limited to all DNA results matching his DNA to any evidence, as well as all derivative evidence produced from knowledge gained and later used for subsequent warrant affidavits, including witness interviews, witnesses, account names, all social media evidence and digital data from third parties only discoverable because of the unlawful seizure and search of Mr. Robinson's body.

### Request for a Hearing.

This motion is "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1528 (11th Cir. 1985). The defendant requests a hearing on this motion.

Respectfully submitted,

/s/Timothy J. Fitzgerald
Farmer and Fitzgerald, P.A.
800 W. De Leon St.
Tampa, FL 33606
813-228-0095 ext. 102
813-928-4846 Direct
Fla. Bar 0780618
tjfitz@me.com

/s/STEVEN H. MALONE
Florida Bar #305545
STEVEN H. MALONE, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
Telephone: 561-805-5805
stevenhmalone@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on March --, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of the electronic filing to counsel of record.

/s   Steven H. Malone
STEVEN H. MALONE